*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v

TREMELL C. MATHEWS,

        Defendant-Appellee.

UNPUBLISHED
September 2, 2021

No. 348155
Wayne Circuit Court
LC No. 18-008966-01-FH

Before: TUKEL, P.J., and SERVITTO and BECKERING, JJ.

TUKEL, P.J. (*dissenting.*)

I respectfully disagree with the majority's conclusion that the present appeal can settle the constitutionality of the seizure of the evidence at issue here. As I explain in more detail below, I see several flaws in the majority's disposition of the case. First, most of the legal and factual issues on which the majority relies were not presented to the trial court, and the trial court never conducted a separate evidentiary hearing, nor did it afford the prosecution the opportunity to present relevant evidence. As a result, the majority usurps the role of the trial court by engaging in fact-finding in the first instance, abandoning our role as an error-correcting court. In doing so, the majority strikes down the entirety of the Detroit Police Department's (DPD) inventory search policy regarding automobiles, even though that issue was never raised below. Although that is unwarranted in my view, I will have little more to say about it, other than that we ought not to decide the issue given that it was not raised by defendant, and that we ought not to be finding facts in the first instance. Although erroneous in my view, the majority's opinion is limited to the 2016 DPD policy, which has been supplanted by a much more extensive 2019 policy.[1] Therefore, although I think the majority is incorrect in striking down the 2016 policy, the majority opinion, even if followed in other pre-2019 cases, will not affect current DPD practices. Additionally, the

---

[1]    See    https://detroitmi.gov/sites/detroitmi.localhost/files/2019-04/Towing-Impound%20Procedures%20Directive%20204.4.pdf.

majority relies on its view of subjective assessments by officers, rather than an objective view of the evidence, as is required under a proper Fourth Amendment analysis.

In short, although the majority ultimately may be correct that the trial court's suppression of the evidence at issue here should be upheld, in my view we cannot do so on this record. I would vacate the trial court's order, as it was legally erroneous, and remand the case to the trial court for further proceedings.

## I. UNDERLYING FACTS

## A. PRELIMINARY EXAMINATION

Before we turn to the evidence, it is important to consider what the record in this case is and is not. No separate suppression hearing was conducted in this case. The district court conducted a preliminary examination, at which defendant argued for suppression of the evidence on the basis that the police had failed to create an impound card regarding the search of the vehicle. Defendant contended that the failure to create an impound card was a violation of the inventory search policy and thus warranted suppression. Defendant also asserted that the prosecution breached its discovery obligations, by failing to provide an impound card, if one existed. Defendant also argued that the seizure of evidence from his person was barred by *Arizona v Gant*, 556 US 332; 129 S Ct 1710; 173 L Ed 2d 485 (2009), even though *Gant* applies only to searches of vehicles incident to arrest, not to searches of one's person.

At the preliminary examination, the district court heard testimony of two officers, at the conclusion of which it declined to suppress the evidence. The preliminary examination testimony established that defendant was pulled over for running a red light. On a video recording which also has audio, taken after defendant was pulled over by officers, defendant admitted that he did not have a valid driver's license; he did not have insurance for the vehicle that he was driving; and he had just been released from jail following an arrest for driving on a suspended license. Officer Michael Bailey ordered defendant out of his vehicle and to stand in front of the police vehicle, where he was on-camera; defendant stood in front of the police vehicle, but was not told that he was under arrest, nor was he placed in handcuffs or advised of his *Miranda* rights, although Officer Bailey testified that defendant was under arrest at the time he was ordered out of the vehicle.[2] Officers searched defendant's person twice without finding contraband. Officers also searched the interior of defendant's vehicle, including the headliner, finding two knotted plastic baggies, one containing three folded lottery tickets and the other containing one folded lottery ticket. Upon finding the folded lottery tickets, which the testimony established often are used to package

---

[2] The majority makes much of the fact that Officer Bailey's testimony was contradicted by that of Officer Yousif Manna, who testified that defendant was not under arrest at the time defendant was ordered out of the vehicle. As stated later in this opinion, I view the subjective views of both Officer Bailey and Officer Mana to be irrelevant to the legal question of whether defendant was under arrest for driving on a suspended license when ordered out of his vehicle, as the question of whether a defendant was under arrest is to be evaluated based on an objective view of the evidence and officers' subjective views are not relevant.

controlled substances, Officer Bailey directed Officer Yousif Manna to again "search defendant good," because Officer Bailey had just found a number of folded lottery tickets in the vehicle. This time, the search of defendant's person disclosed a knotted sandwich bag containing heroin, which resulted in the present charges, and a separate knotted baggie containing marijuana; the preliminary chemical analysis of the powdery substance found in the headliner was inconclusive, and those items were forwarded to the Michigan State Police Crime Laboratory for further testing.

Defendant argued that the search of his vehicle was an invalid inventory search, principally on the basis that no impound card of the vehicle was produced. No argument as such was made regarding the search of the headliner, and no testimony, for or against the validity of such a search of the headliner was offered. At the conclusion of the preliminary examination, the district court bound defendant over, and reminded the prosecution of its discovery obligations, which admonition related only to the failure to produce impound cards—the sole basis which had been advanced in support of suppression.

## B. CIRCUIT COURT MOTION TO SUPPRESS

Defendant moved in the circuit court to suppress the evidence found in the third and final search of his person. Relying on *Arizona v Gant*, 556 US 332; 129 S Ct 1710; 173 L Ed 2d 485 (2009), defendant asserted that the final search of his person, which yielded heroin, could not have been a valid search incident to arrest, because *Gant* only permits a search incident to arrest for evidence of the crime of arrest, and at that time, defendant maintains, there was probable cause to arrest him only for driving on a suspended license and without insurance. Defendant's argument for suppression was plainly erroneous as a matter of law, as *Gant* applies only to searches of vehicles incident to arrest, not to searches of persons, as is discussed in greater detail below. Defendant also alleged that the search of his vehicle was an unlawful inventory search, solely on the basis that officers had not issued an impound ticket to him, as required by DPD policy. Although he never used the term "fruit of the poisonous tree," in the body of his motion, nor did he make an argument about why the doctrine should apply, defendant concluded his motion by stating "WHEREFORE, Defendant Tremell Mathews respectfully requests that the evidence seized by police officers be suppressed as fruit of the poisonous tree and the charge dismissed."[3] He also added, "Defendant also respectfully requests for the dash camera video to be produced in compliance with the court's discovery order and any other relief this Honorable Court finds to be in the interest of good conscious [sic] and justice."

On February 8, 2019, the circuit court held a hearing, at which the parties addressed the suppression issue. No separate evidentiary hearing was conducted, nor did the trial court inquire as to whether either party wanted to adduce additional evidence. Nevertheless, the prosecutor stated that she did not know whether an impound card existed and asked for additional time to investigate. Defense counsel argued that the parties already had been given over four months to exchange discovery. The trial court granted defendant's motion to suppress, on the basis that "the failure of the People to produce the impound cards speaks to the [DPD's] noncompliance with

_____

[3] The majority holds that the fruit of the poisonous tree doctrine applies.

their own inventory policy." In fact, in suppressing evidence of the inventory search of defendant's vehicle on the basis that the prosecution failed to comply with discovery orders, the trial court applied the wrong legal standard, and also prevented the prosecution from demonstrating factually that it had in fact issued an impound card in accordance with DPD policy.[4] The trial court's statement that "the failure of the People to produce the impound cards" somehow demonstrates "the [DPD's] noncompliance with their own inventory policy," does not logically follow, as the DPD and the Prosecutor's office are two separate entities. It is from that order of suppression (and the associated order of dismissal) that the prosecutor appeals.

## II. ANALYSIS

## A. SEARCH INCIDENT TO ARREST

The majority rejects the search incident to arrest doctrine as a basis for upholding the search at issue here. Ordinarily, I would decline to address that issue because it was not relied upon by the trial court, although the trial court could properly consider it if the case were remanded. Nevertheless, in light of the majority's resolution of the issue, I will discuss it.

## 1. INITIAL CONSIDERATIONS

The majority makes reference to *Arizona v Gant*. The majority is correct that *Gant* addresses only searches of *vehicles*, not persons, incident to arrest. Nevertheless, the majority holds that the search of defendant's vehicle invalidates the search incident to arrest in which the heroin was found.

*Gant* held that

> Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest. When these justifications are absent, a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show *that another exception to the warrant requirement applies*. [*Gant*, 556 US at 351 (emphasis added).]

*Gant* thus left intact the well-established rule allowing a complete physical search of a person who has been lawfully arrested:

> It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment. This general exception has historically been formulated into two distinct propositions. The first is that a search may be made of the person of the arrestee by virtue of the lawful

---

[4] The videotape shows an officer filling out an impound card, and the prosecution made the card a part of its appendix filed in this Court. Although not a part of this record, due to the trial court's not permitting the prosecution a supplementary evidentiary hearing, as discussed below, the impound card could be made a part of the record if the case were remanded.

-4-

arrest. The second is that a search may be made of the area within the control of the arrestee. [*United States v Robinson*, 414 US 218, 224; 94 S Ct 467; 38 L Ed 2d 427 (1973).]

This case involves the first aspect of the doctrine, the search of defendant's person, as that is where the heroin was found, not in the vehicle.

> Throughout the series of cases in which the Court has addressed the second proposition relating to a search incident to a lawful arrest—the permissible area *beyond the person of the arrestee which such a search may cover*—no doubt has been expressed as to the unqualified authority of the arresting authority to search the person of the arrestee. [*Id*. at 225 (emphasis added).]

Significantly, and unlike the permissible scope of the search of vehicles, the authority to search the person of an arrestee is not limited by the likelihood of finding evidence, the risk of danger under the circumstances, or any other case-specific fact, but rather is a per se rule permitting a full search of the person in any case involving a valid custodial arrest:

> The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment. [*Id*. at 235.]

Thus, it is necessary to analyze what does and does not constitute a valid arrest for Fourth Amendment purposes.

2. WHAT CONSTITUTES AN ARREST UNDER THE FOURTH AMENDMENT

"Remarkably, the [United States] Supreme Court has never defined the word 'arrest' with any precision and lower court decisions conflict as to its meaning." Clancy, *What Constitutes an Arrest within the Meaning of the Fourth Amendment*, 48 Vill L Rev 129, 129 (2003), available at: https://digitalcommons.law.villanova.edu/vlr/vol48/iss1/3. Nevertheless, certain principles are clear. Under *Berkemer v McCarty*, 468 US 420, 442; 104 S Ct 3138; 82 L Ed 2d 317 (1984) (citations omitted), a case cited by the majority, in determining whether an individual was in custody, the United Stated Supreme Court has concluded, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." The Court applied that test in the context of deciding "whether the roadside questioning of a motorist detained pursuant to a routine traffic stop should be considered 'custodial interrogation.' " *Id*. at 435; see also *id*. at 438 (referring to "the typical traffic stop") and *id*. at 439 (referring to "the usual traffic stop").

"Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose 'observations lead him reasonably to suspect' that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to 'investigate the circumstances that provoke suspicion.' " *Id*. at 439. " '[T]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation.' " *Id*., quoting *Terry v Ohio*, 392 US 1, 29; 88 S Ct 1868; 20 L Ed 2d 889 (1968). "Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. . . . And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released." *Id*. at 439-440. Thus, "[t]he comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*. The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*." *Id*.

Applying those principles to the facts of the case, the Court held that "Although Trooper Williams apparently decided as soon as respondent stepped out of his car that respondent would be taken into custody and charged with a traffic offense, Williams never communicated his intention to respondent. A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Id*. at 442.

Thus, rather than supporting the majority's position, *Berkemer v McCarty* undermines it. If the present case involved an "ordinary traffic stop," there might be merit to the majority's contention that defendant was not in custody when Officer Bailey ordered him out of his vehicle. But this case involves anything other than an ordinary traffic stop. It is undisputed that defendant's license was suspended, as the majority concedes, and defendant is clearly heard on the video telling the officers that he had just been released from jail for the same offense. It seems to me quite unlikely, bordering on the ludicrous, to suppose that a reasonable person who had (1) been pulled over for running a red light; (2) admitted to officers that he did not have a valid driver's license or insurance; and (3) told officers that he had just been released from jail for driving on a suspended license, would objectively conclude that he was not under arrest and, after possibly receiving a traffic citation, would be permitted to drive off.[5] As the Supreme Court noted in *Berkemer v McCarty*,

> A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way. [468 US at 437.]

---

[5] The fact that defendant's recent episode of driving on a suspended license resulted in his arrest and jailing, and not merely the issuance of a citation, simply reinforces that conclusion.

-6-

Such could not have been the reasonable conclusion of one in defendant's situation— the officers *could not* have released defendant to drive away, because to do so would have been putting an unlicensed and uninsured driver back on the street, implications which the majority never confronts. As the Supreme Court further noted, "unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released." *Berkemer*, 468 US at 439-440. That is quite unlike the situation here, in which, at the moment he ordered defendant out of the vehicle, officer Bailey had probable cause to arrest defendant for driving on a suspended license. This fact completely belies the assertion by the majority that "[t]he search of defendant's vehicle was the only thing that supplied the police with probable cause to arrest defendant and search him a final time for contraband"; the police had probable cause to arrest prior to ordering defendant out of the vehicle, and his arrest fully justified a search of his person. *Robinson*, 414 US at 224.

In order to get around that point, the majority argues that defendant was not arrested for driving on a suspended license, but rather was arrested for the heroin once it was found. Although the majority makes a number of arguments in that regard, none has merit.

The majority first argues that Officer Bailey and Officer Mana contradicted each other about the reason for the arrest. Officer Bailey testified that defendant was under arrest for driving on a suspended license at the moment he was ordered out of the vehicle; Officer Mana testified that defendant was not under arrest until the heroin was discovered. While it is true that the two officers contradicted each other, the majority's conclusion—that such a contradiction has legal significance—is mistaken, because its analysis is based on subjective beliefs by officers as to whether and when an arrest took place; however, the proper approach to search and seizure issues is that such questions are evaluated on an objective, reasonable person basis. See *Whren v United States*, 517 US 806, 813; 116 S Ct 1769; 135 L Ed 2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *Berkemer v McCarty*, 464 US at 442 ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.").

Nothing in the record even remotely suggests that Officer Mana communicated any sentiment to defendant that, until the heroin was discovered, he was not under arrest. Thus, that aspect of the case is exactly like *Berkemer v McCarty*, in which the Court ignored the subjective views of Trooper Williams, because "Williams never communicated his intention to respondent. A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." See 468 US at 442. Thus, a proper analysis here requires that the Court completely ignore any subjective views of Officer Mana, and of Officer Bailey as well.

The limitation that a court consider only the objective facts also controls regarding a consideration of an officer's motivation for searching. In other words, it is completely irrelevant whether an officer suspected that someone was in possession of drugs, and wanted to search to confirm or dispel that suspicion, so long as the objective facts provided probable cause to arrest. See *Whren v United States*, 517 US 806, 813; 116 S Ct 1769, 1774; 135 L Ed 2d 89 (1996), in which officers' suspicion of drug dealing led to a traffic stop and seizure of drugs. Earlier cases "established that 'the fact that the officer does not have the state of mind which is hypothecated

-7-

by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.' " *Id.* at 813 (citation omitted). Thus, "an officer's 'subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.' " *People v Hammerlund*, 504 Mich 442, 479 n 52; 939 NW 2d 129 (2019) (ZAHRA, J., dissenting), quoting *Devenpeck v. Alford*, 543 US 146, 153;125 S Ct 588; 160 L Ed 2d 537 (2004). In *Devenpeck*, police suspected Alford of impersonating a police officer, and arrested him for that offense. Officers discovered a tape recorder in Devenpeck's car, which was seized incident to arrest, and he was charged with making an illegal recording. Defendant sued on the ground that there was not probable cause to arrest him for impersonating an officer, and the offenses involving the tape recording "were not 'closely related' to the offense invoked by" the officer as he took Alford into custody. *Id.* at 152.

In rejecting that argument, the Supreme Court held:

> Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause. That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause. As we have repeatedly explained, the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action. The Fourth Amendment's concern with reasonableness allows certain actions to be taken in certain circumstances, whatever the subjective intent. Evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer. [*Devenpeck*, 543 US at 153 (quotation marks, brackets, and citations omitted).]

The majority's entire discussion is premised on Officer Bailey arresting defendant for a drug offense, as to which there was not probable cause when he was ordered out of the vehicle; but the majority's conclusion that Officer Bailey subjectively wanted to arrest based on and to search for drugs is legally irrelevant, as Officer Bailey's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Id.* Thus, it makes no difference that Officer Bailey may have wanted to arrest defendant because he suspected that defendant was in possession of drugs, provided that objectively a person in defendant's situation would have reasonably concluded that he was in custody and there was an objective basis for making such an arrest for *some* offense. For the reasons stated, there was more than adequate probable cause to arrest defendant for driving on a suspended license.

The majority relies on two pieces of evidence from the preliminary examination to determine that defendant was not in custody. First, Officer Bailey did not handcuff defendant or advise him of *Miranda* rights after defendant was ordered out of the vehicle. Again, the absence of such actions could not cause a reasonable person, with defendant's history of driving on a suspended license, to objectively conclude that he was not under arrest and could simply leave upon the conclusion of their interaction, even if officers did not find heroin. Additionally, the majority relies on the fact that Officer Bailey did not state to defendant that defendant was under

arrest; in fact, Officer Bailey told defendant words to the effect of "shut the car off real quick man; I ain't gonna hold you up too long." Here again, the majority relies on its own findings of fact, as there are none by the trial court and Officer Bailey's words are susceptible of more than one meaning. The majority interprets the words to mean "I'm not going to hold you up too long because you are not under arrest." However, in context, they easily could have meant "I'm not going to hold you up too long here because I am taking you to the police station for booking, in light of the fact that you admitted you were driving on a suspended license, have no proof of insurance, were just released from jail for driving on a suspended license, and as you have no valid driver's license I cannot permit you to drive away." It is important in that regard to note that Officer Bailey made his statement *after* defendant admitted that he had no valid driver's license or insurance, and had just been released from jail, so Officer Bailey's statement was in response. Again, the majority ought not be finding such facts in the first instance, but setting that aside, the majority also applies the wrong legal standard: what matters here is not what defendant subjectively understood (or might have understood) about his situation, but what a reasonable person in his situation objectively would have thought.[6]

Indeed, in light of defendant's inability to drive away lawfully due to his suspended-license status, the officers could not have simply released him, as the majority seems to conclude should have happened under the circumstances; at a minimum, the police would have had to impound the vehicle, and consequently would have had to conduct an inventory search. All of those are facts which ought to be weighed by the trial court in the first instance, to determine what a reasonable person in defendant's situation would have objectively perceived. But if the reasonable conclusions of a person in that situation are as I describe them, then defendant was lawfully in custody for driving on a suspended license and thus was subject to "a full search of the person." *Robinson*, 414 US at 235. The majority offers no reason why officers could not search defendant a second or third time, except to state that he was not arrested for driving on a suspended license, due to Officer Bailey's putative subject intentions, and that probable cause did not exist until lottery tickets were found in the vehicle. Given that the objective facts provided probable cause to arrest defendant for driving on a suspended license, however, the searches of defendant's person were lawful incident to arrest. And if officers had missed the heroin in his pockets, as they did during the first two searches, they nevertheless would have found it at the station following his booking. Again, I would not decide this case on the basis of any such suppositions; I would simply vacate the incorrect decision by the trial court and remand for additional proceedings. However, I draw out what I believe to be very much contestable facts only to underscore the majority's role in finding facts in the first instance.

---

[6] The majority opinion is filled with statements of fact-finding and factual conclusions: "Two things also indicate that the search of defendant's vehicle served as a pretext for investigation, rather than a normal police procedure."; "As previously indicated, it is highly doubtful that defendant was, in fact, actually arrested when he exited his vehicle."; "Rather, it is readily apparent that the search of the vehicle was conducted for the express purpose of investigating potential evidence of any other crime[.]" As noted, Officer Bailey's state of mind does not matter, given that probable cause to arrest defendant existed based on his driving on a suspended license. *Robinson*, 414 US at 224; *Devenpeck*, 543 US at 153.

## B. INVENTORY SEARCH

### 1. PRELIMINARY CONSIDERATIONS

The parameters of a permissible inventory search are generally settled:

> An inventory search is a well-defined exception to the warrant requirement of the Fourth Amendment. An inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence. Rather, the search protects an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property and guards the police from danger. The search must be conducted reasonably, in good faith, and pursuant to standardized police procedures designed to produce an inventory, including procedures that regulate the opening of containers found during inventory searches. [*People v Mead*, 320 Mich App 613, 625-626; 908 NW2d 555 (2017).]

In this case, the question of the lawfulness of the seizure of the heroin from defendant's pocket as the fruit of an inventory search is bound up with the question of whether we have a proper record to consider the issues raised. The inventory search issue presented here originates in a somewhat unusual context: according to the majority, as far as the inventory search doctrine is concerned, the issue of whether the heroin was lawfully seized from defendant's pocket turns on whether the antecedent search of the vehicle was lawful as an inventory search.[7] A search of an arrestee's person can constitute an inventory search, as "[I]t is entirely proper for police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed. A range of governmental interests support an inventory process." *Illinois v Lafayette*, 462 US 640, 646; 103 S Ct 2605; 77 L Ed 2d 65 (1983). The inventory search process "not only deters false claims but also inhibits theft or careless handling of articles taken from the arrested person. Arrested persons have also been known to injure themselves—or others—with

---

[7] The majority, citing *People v Toohey*, 438 Mich 265, 271-272; 475 NW2d 16 (1991), states that "Under the inventory search exception, the police may conduct an inventory search of a vehicle, in accordance with its departmental regulations, that is being impounded following the driver's valid arrest." In *Toohey*, the search of the impounded vehicle was preceded by an arrest, and that statement by our Supreme Court reflects the facts of the case. Indeed, an arrest may even be the most common occurrence leading to an inventory search of an impounded vehicle, but an arrest is not a legal prerequisite to such an inventory search. "In the interests of public safety and as part of what the Court has called 'community caretaking functions,' automobiles are frequently taken into police custody. Vehicle accidents present one such occasion." *South Dakota v Opperman*, 428 US 364, 3689; 96 S Ct 3092; 49 L Ed 2d 1000 (1976) (citation omitted). "Police will also frequently remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic. The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *Id*. at 368-369. See also 2016 DPD Impoundment Policy, § 204.4, Procedures, (providing that vehicles can be impounded for a number of reasons, including evidence, safekeeping, accidents, and abandonment).

belts, knives, *drugs* or other items on their person while being detained." *Id.* (emphasis added). Thus, it is clear that if an inventory search of defendant's person was justified, a search which would disclose drugs was properly within its scope. Moreover, an inventory search of one's person is justified based not only on how an arrestee might use such dangerous items while in custody, but also based on what the person might do with them upon release. "Dangerous instrumentalities—such as razor blades, bombs, or weapons—can be concealed in innocent-looking articles taken from the arrestee's possession. The bare recital of these mundane realities justifies reasonable measures by police to limit these risks—either while the items are in police possession or at the time they are returned to the arrestee upon his release." *Id.*

## 2. INVENTORY SEARCH DOCTRINE AS APPLIED TO THIS CASE

The majority's opinion jumps right to the merits of the search. However, as I have noted, no separate suppression hearing was held in the circuit court. The district court considered the suppression issue which was presented to it, the alleged non-creation of an impound card, in the context of the preliminary examination, without a separate suppression hearing. The manner in which the district court handled the suppression issue and the evidentiary hearing aspect of it was within its discretion. See MCR 6.110(D)(2). The circuit court, however, was required to afford the prosecution an opportunity for an evidentiary hearing, even if the district court had held a full evidentiary hearing (which it did not). See MCR 6.110(D)(2) (Providing that in the context of a preliminary examination, "The decision to admit or exclude evidence, with or without an evidentiary hearing, does not preclude a party from moving for and obtaining a determination of the question in the trial court on the basis of '(a) a prior evidentiary hearing, or (b) a prior evidentiary hearing supplemented with a hearing before the trial court.' "). The majority sweeps aside the plain language of the rule, which applies to "a party," as being inapplicable on the basis that "that rule merely provides that if a court made an evidentiary ruling on a piece of evidence (with or without an evidentiary hearing) during the preliminary examination, the defendant is not precluded from moving for an evidentiary hearing in regard to the admission of that same piece of evidence in the trial court or at trial." As is plain, the rule applies to "a party," and not merely a defendant. And while the prosecution never moved for a supplemental or de novo evidentiary hearing in the trial court, it never had a chance to do so, as the trial court simply proceeded to rule on the basis of the existing record. It is now clear that in fact there was an impound ticket created, as the prosecution included it in its appendix filed in this Court. I believe this fact alone justifies a remand for supplementation of the record, as proof that an impound card was created would cast the issues in a very different light.

Although the circuit court's failure to conduct an evidentiary hearing might have been harmless in light of the circuit court's ruling (which was based solely on the failure to produce the impound card in discovery), it is not harmless in the context of the majority opinion.[8] That is so

---

[8] The circuit court's entire rationale was that "the failure of the People to produce the impound cards speaks to the [DPD's] noncompliance with their own inventory policy." Factually, however, the videotape established that an impound ticket was issued, and, as noted, the prosecution included it in an appendix in this Court. Legally, the trial court improperly assessed the non-production in discovery of the impound tickets under the Fourth Amendment standard rather than

because the majority engages in factfinding in the first instance. See, e.g., *In re Martin*, 200 Mich App 703, 717; 504 NW2d 917 (1993) (alteration in original) ("It is not the function of an appellate court to decide disputed questions of fact in the first instance and then choose between affirmance or reversal by testing its factual conclusion against that which the trial court *might* have . . . reached."). That rule flows from our role as an error-correcting court, see, e.g., *Jawad A Shah, MD, PC v State Farm Mut Auto Ins Co*, 324 Mich App 182, 210; 920 NW2d 148 (2018) (describing this Court as an "error-correcting court"); MCR 2.613(C) (providing that "Findings of fact by the trial court may not be set aside unless clearly erroneous. In the application of this principle, regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it.").[9]

Thus, there was no testimony offered on a number of issues which the majority reaches out and decides in the first instance. For example, the majority questions how a search of the headliner of a vehicle could serve the stated purposes of an inventory search "to protect defendant's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." The majority reaches that conclusion without the benefit of any testimony regarding the search of the headliner, why the officers acted as they did,

---

under the standard applicable to discovery violations. Compare *People v Frazier*, 478 Mich 231, 247-250; 733 NW2d 713 (2007) (addressing the exclusionary rule as a remedy for a Fourth Amendment violation due to police misconduct) with *People v Greenfield*, 271 Mich App 442, 456 n 10; 722 NW2d 254 (2006) (addressing the standard for exclusion of evidence due to a discovery order violation). Indeed, "The [Exclusionary] rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations." *Davis v United States*, 564 US 229; 236-237; 131 S Ct 2419; 180 L Ed 2d 285 (2011). But whether evidence should be suppressed because of a discovery violation involves very different considerations, and requires "a balancing of the interests of the courts, the public, and the parties" and an "inquiry into all the relevant circumstances, including the causes and bona fides of tardy, or total, noncompliance, and a showing by the objecting party of actual prejudice." *People v Davie (After Remand)*, 225 Mich App 592, 598; 571 NW2d 229 (1997) (citations and quotation marks omitted); see also *Greenfield*, 271 Mich App at 455-456 n 10 (noting requirement of actual prejudice to justify suppression for non-compliance with discovery obligation). And of course, a garden variety discovery violation—as opposed to the obligation to provide exculpatory information, see *Brady v Maryland,* 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963); *United States v Bagley,* 473 US 667, 105 S Ct 3375; 87 L Ed 2d 481 (1985)—cannot rise to the level of a constitutional violation, as "[t]here is no general constitutional right to discovery in a criminal case." *People v Elston,* 462 Mich 751, 765; 614 NW2d 595 (2000).

Here, the trial court in effect constitutionalized the discovery rules, by applying the Fourth Amendment standard to what was alleged to be a discovery violation. This was a clear error of law, which by definition is an abuse of discretion. See *People v Al-Shara*, 311 Mich App 560, 566; 876 NW2d 826 (2015) ("A trial court also necessarily abuses its discretion when it makes an error of law.").

[9] The majority's factfinding is extensive. See n 7 of this opinion.

-12-

and whether they believed a search of the headliner was permitted by DPD search policy.  If the parties had known that the majority in this Court was going to consider suppression on a basis not argued by defendant; and if the circuit court had then conducted an evidentiary hearing on that basis, as it was required to do if requested by a party, see MCR 6.110(D)(2)—and which the prosecution almost certainly would have requested had it known that the officers' actions in conducting the search would come under scrutiny in the manner called into question by the majority—then we would have before us the officers' justification for the search of the headliner. If we knew the officers' actual motivations for acting as they did, those actions might be cast in a very different light, as it is of course the officers who actually conduct searches and arrests who are most familiar with the hiding places and tactics used by drug traffickers.  Indeed, opinions of courts which had before them fully developed records demonstrate that headliners can be used to hide dangerous instrumentalities, the discovery of which is part of the justification for the inventory search doctrine, see *Lafayette*, 462 US at 646, and the justification for the policy can be based not only on what an arrestee has access to at the time of arrest, but also based on what will be available following release, *id*.

For example, in *People v Logan*, unpublished opinion of the California Court of Appeals, issued December 29, 2016 (Docket No. B271723), p 2, a loaded .38 caliber handgun was found "within reach in the van, in the headliner."[10]  As a legal matter in this case, it is unimportant whether a weapon inside the headliner would have been quickly available to defendant; accessibility is a limitation on the search incident to arrest doctrine as applied to vehicles, not to the standards for an inventory search.  See *Gant*, 556 US at 351 (emphasis added) ("Police may search *a vehicle* incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe *the vehicle* contains evidence of the offense of arrest.  When these justifications are absent, a search of an *arrestee's vehicle* will be unreasonable unless police obtain a warrant or show *that another exception to the warrant requirement applies*.").  But had there been a proper evidentiary hearing, the officers, through their experience, might well have been able to shed light on how readily accessible guns or drugs hidden in a vehicle's headliner are in practice, which may have been important to the resolution of both the inventory search and search incident to arrest issues.  And it is readily apparent that a gun, or drugs, are "dangerous instrumentalities" which properly may be the subject of an inventory search policy, to limit the danger they otherwise would pose to the police and public "at the time they are returned to the arrestee upon his release."  *Lafayette*, 462 US at 646.

The majority reiterates, based principally on the search of the headliner, that Officer Bailey harbored a secret intention to search for evidence of criminality, and that such an intention vitiated the validity of an inventory search.  While I have noted why the search of the headliner may have been justified by an inventory search policy and there is factually no evidence of any motivation by the officers other than proper police work, "the fact that an officer suspects that contraband may be found does not defeat an otherwise proper inventory search." *United States v Lumpkin*, 159

---

[10] It is of course unimportant whether *Logan*, as an unpublished opinion, has precedential value.  I cite it for the *fact* that officers found a loaded handgun in a vehicle's headliner, not for any legal conclusion.

F3d 983, 987 (CA 6, 1998) (citations omitted); *id*., citing *United States v Lewis,* 3 F3d 252, 254 (CA 8, 1993) (alterations in original) ("noting that '[t]he presence of an investigative motive . . . does not invalidate an otherwise valid inventory search' ").

Any conclusion about the propriety of an inventory search is unwarranted on this record. See, e.g., *United States v Hollister*, unpublished opinion of the United States District Court of Minnesota, issued July 12, 2012 (Docket No. 12–CR–13 (PJS/TNL)), p 16 (holding that "Absent any record before this Court on the inventory search procedures, this Court cannot, for example, assess whether searching under the headliner would have exceeded the scope of the inventory search"). Although the error in this regard may have been initiated by the circuit court, the majority exacerbates the problem, because instead of remanding the case to the circuit court to conduct a proper evidentiary hearing, it simply finds facts it assumes to be true. See *Tingley v Kortz*, 262 Mich App 583, 588; 688 NW2d 291 (2004) ("Ordinarily, we do not address issues not raised below or on appeal, or issues that were not decided by the trial court."); *People v Miller*, 238 Mich App 168, 172; 604 NW2d 781, 783 (1999) (declining to consider an issue because the "[d]efendant did not raise his constitutional challenge in the list of questions presented" and "nothing in defendant's statement of questions presented suggests that he is presenting a constitutional challenge"); MCR 7.212(C)(5).

And finally, it is unclear to me why the search of the vehicle is even material, as nothing seized from the vehicle was used to charge defendant, or was to be offered against him at trial. The majority argues that the search of defendant's person which yielded heroin was fruit of the poisonous tree. Given defendant's arrest, his person was subject to an inventory search prior to being jailed. The lawfulness of the search of the vehicle could not affect the validity of search of defendant's person, because that search was justified either as incident to his arrest, or as an inventory search based on his arrest. The lawfulness or unlawfulness of the search of the vehicle could not affect those bases for searching defendant's person. And even if one assumes that defendant's person would not have been searched again and the heroin discovered but for the discovery of the folded lottery tickets, that is at most a factual question, and without a proper evidentiary hearing and factfinding by the trial court on that issue, we cannot know that.

### III. CONCLUSION

For the reasons stated, I would vacate the order of suppression and the order dismissing the case, and remand for further proceedings. I therefore respectfully dissent from the majority opinion.

/s/ Jonathan Tukel